**STEPTOE & JOHNSON LLP**
FILIBERTO AGUSTI (*pro hac vice forthcoming*)
JOSHUA R. TAYLOR (*pro hac vice forthcoming*)
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067-5052
Telephone:    (310) 734-3200 // Facsimile: (310) 734-3300
Email: fagusti@steptoe.com
            jrtaylor@steptoe.com

RECEIVED
AND FILED

2014 JUN  9  PM 2 30

U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

**RICE REUTHER SULLIVAN & CARROLL, LLP**
DAVID A. CARROLL (NSB # 7643)
ANTHONY J. DIRAIMONDO (NSB # 10875)
3800 Howard Hughes Parkway, Suite 1200
Las Vegas, Nevada 89169
Telephone:  (702) 732-9099 // Facsimile: (702) 732-7110
Email: dcarroll@rrsc-law.com
            adiraimondo@rrsc-law.com

*Attorneys for Debtor's Counsel*
*GREENBERG TRAURIG, LLP and*
*BOB L. OLSON*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| In re: | Case No. BK-S-11-14153-BTB |
|---|---|
| PARK CENTRAL PLAZA 32, LLC, | Chapter 11 |
| Debtors. | **MOTION OF GREENBERG TRAURIG, LLP AND BOB L. OLSON FOR EXPEDITED ORDER UNDER SECTION 350 OF THE BANKRUPTCY CODE REOPENING CHAPTER 11 CASE** |
| | **HEARING DATE:  OST REQUESTED** |
| | **HEARING TIME:  OST REQUESTED** |

# 217872    $ 1 1167 ≈

MOTION OF GREENBERG TRAURIG, LLP AND BOB L. OLSON FOR EXPEDITED ORDER UNDER
SECTION 350 OF THE BANKRUPTCY CODE REOPENING CHAPTER 11 CASE

1    Greenberg Traurig, LLP ("GT") and Bob L. Olson ("Olson" and collectively with GT on,

2    the "Debtor's Counsel"), former reorganization counsel to Park Central Plaza 32, LLC (the

3    "Debtor" or "Park Central" or "PCP"), and a party in interest hereby file this motion (the

4    "Motion") for entry of an order reopening the above-captioned chapter 11 case (the "Chapter 11

5    Case") for the limited purpose of adjudicating an action brought in state court to revisit a number

6    of orders entered in this case, including whether Debtor's Counsel competently discharged their

7    duties as § 327 professionals during the Chapter 11 Case. In support of this Motion, Debtor's

8    Counsel respectfully submits the following Points and Authorities as follows:

9                                    **PRELIMINARY STATEMENT**

10    Debtor's Counsel hereby seek to reopen this bankruptcy case to allow this Court to

11    resolve an action brought in state court that seeks to revisit a settlement that resulted in dismissal

12    of the bankruptcy case. The settlement was approved by this Court, as was a retention of

13    Debtor's Counsel approved by this Court, and an award of fees approved by this Court. The

14    plaintiff -- a former debtor in a single-real-estate-asset bankruptcy proceeding in this Court --

15    claims that Debtor's Counsel failed to provide competent counsel to plaintiff. The Debtor asserts

16    that, had it received competent advice, it would have pursued a strategy under which this Court

17    would have awarded it more than what it received in the settlement which this Court approved.

18    Plaintiff further asserts that, had it received competent advice, this Court would have approved a

19    plan of reorganization containing terms far more beneficial to the Debtor. Instead of bringing to

20    this Court these claims, which seek to change the results created by this Court's orders and assert

21    what this Court would ostensibly have done, plaintiff has brought its action in state court, which

22    lacks familiarity with the facts of this case or the governing bankruptcy context.

23    Of course, the real beneficiaries of any recovery by the single-asset debtor would be the

24    debtor's equity interest holders, who still control the debtor. Those equity owners benefitted from

25    the settlement agreement approved by this Court under which they were released from their

26    guaranties of the debtor's debt to the senior secured lender. Having benefitted from a settlement

27

28                                                    2

1   in this Court, the equity owners now seek to improve on the settlement terms by a collateral

2   attack on this Court's orders.

3        This Court has exclusive jurisdiction over matters relating to the services rendered by a

4   § 327 professional.  Moreover, this Court expressly retained jurisdiction over the Settlement

5   Order, which specifically addresses the payment to Debtor's Counsel, the amounts to be paid to

6   equity interest holders, and the liquidation of the debtor's assets.  Plaintiff's claims plainly

7   implicate this Court's core jurisdiction.  Moreover, even though the plaintiff asserts that this

8   Court would have approved certain "beneficial" plan terms, plaintiff wants to have a state court

9   decide what plan of reorganization this Court would have approved.

10       This Court should not permit plaintiff and its equity owners to make an end-run around

11   the proper forum for resolving claims against court-approved professionals and collaterally attack

12   this Court's Orders.  The plaintiff's gambit is particularly dubious since the state court is

13   unfamiliar with the facts of this case or with the realities of a bankruptcy proceeding.  For these

14   reasons, the Court should reopen the Chapter 11 Case and, pursuant to Debtor's Counsel's

15   separately submitted Notice of Removal, proceed to resolve the State Court Action.

16   **JURISDICTION**

17       This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and

18   1334.  This matter is a core proceeding under 28 U.S.C. § 157. Venue is proper in this district

19   pursuant to 28 U.S.C. §§1408 and 1409.

20       The statutory predicates for the relief requested herein are section 350 of Title 11 of the

21   United States Code (the "Bankruptcy Code"), Rules 5010 and 9024 of the Federal Rules of

22   Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 60 of the Federal Rules of Civil

23   Procedure.

24

25

26

27

28

3

# BACKGROUND

*Park Central Plaza 32, LLC*

Park Central Plaza 32, LLC is a Nevada limited liability company. PCP is the plaintiff in the State Court Action.[1]

*Park Central and Guarantor Liability to METEJEMEI, LLC*

PCP and Nevada State Bank ("NSB") entered into an Acquisition and Development Loan Agreement, dated February 10, 2004 (the "Loan") to purchase an office and retail real estate development at 5700-5990 Losee Road, North Las Vegas, Nevada (the "Property"). As security for the Loan, PCP provided NSB with a Deed of Trust and Security Agreement with Assignment of Rents and Fixture Filing (Acquisition and Development) (the "Deed of Trust"), granting NSB a security interest in the Property and an assignment of rents derived from the Property.[2]

Infinity, Crest Ridge, Juli Koentopp, Brian Spilsbury and Kevin Spilsbury (each a "Guarantor" and collectively "Guarantors")[3] executed a written Guaranty of Loan, effective as of February 10, 2004 ("Guaranty").[4]

On or about January 15, 2011, the Loan matured pursuant to its own terms, but PCP failed to pay the amount due. On February 28, 2011, NSB provided PCP with written notice of default, demanding payment of $25,424,490.00 on or before March 10, 2011.[5]

On or about March 10, 2011, METEJEMEI, LLC, a Nevada Limited Liability Company ("MET") acquired all right, title and interest of NSB under the Loan Agreement, Loan, and the Deed of Trust.[6]

---

[1] Complaint (as defined below) p. 1.

[2] Complaint ¶¶ 6 & 9.

[3] Infinity Plus Investments, LLC, ("Infinity") and Crest Ridge, LLC ("Crest Ridge"), both Nevada limited liability company were and are the managing members of Park Central. During the proceeding, Infinity and Crest Ridge were equity interest holders in the Debtor. Juli Koentopp was the Manager and equity interest holder of Infinity and Brian Spilsbury and Kevin Spilsbury were Managers and equity interest holders of Crest Ridge.

[4] Complaint ¶ 11.

[5] Complaint ¶ 13.

[6] Complaint ¶ 14.

4

1   On or about March 18, 2011, MET provided PCP with written notice of an Event of

2   Default under the Deed of Trust and enforcement of its security interest in rents pursuant to NRS

3   107A.220.[7]

4       *Bankruptcy Filing*

5       On March 23, 2011, PCP filed a voluntary petition for relief under Chapter 11 of Title 11

6   of the United States Code initiating the above-captioned Chapter 11 Case. This was a "single

7   asset" case, as the Debtor's sole asset was a developed real estate project. The case was filed as

8   the party that held a mortgage on the real estate, MET began to enforce its rights vis-à-vis PCP

9   and its assets.[8]

10      On April 19, 2011, MET commenced an action against the Guarantors to enforce the

11  Guaranty of PCP's Loan (the "Guarantor Action").[9]

12      *Employment of GT & Johnson*

13      On April 7, 2011, the Debtor filed an Application for Order Authorizing Employment of

14  Greenberg Traurig, LLP, as Debtor's Reorganization Counsel effective as of the Petition Date

15  [Bankr. ECF No. 27] (the "GT Employment Application").[10]

16      On April 14, 2011, this Court held a hearing on the GT Employment Application. At that

17  hearing, potential conflicts of interest were discussed.[11] On April 29, 2011, the Court entered an

18  Interim Order authorizing the employment of GT through May 17, 2011.[12] On May 17, 2011,

19  this Court held a second hearing on the GT Employment Application. Potential conflicts of

20  interest were again discussed with the Court.[13] On June 7, 2011, the Court entered a Second

21

22

23  _____

    [7] Complaint ¶¶ 17-18.
24  [8] Complaint ¶¶ 20-21.
    [9] Complaint ¶ 27.
25  [10] Complaint ¶ 24 & GT Employment Application.
    [11] *See* Transcript of April 14, 2011 Hearing [Bankr. ECF No. 155] at pp. 5-6.
26  [12] Complaint ¶ 28 & *See* Interim Order Authorizing Employment and Retention of
    Greenberg Traurig, LLP, As Debtors Reorganization Counsel effective as of the Petition Date
27  [Bankr. ECF No. 61] (the "First Interim Employment Order").
    [13] *See* Transcript of May 17, 2011 Hearing [Bankr. ECF. No. 140] at pp. 10-15.
28                                              5

_____

1  Interim Employment Order authorizing the continued employment of GT, this time through June

2  7, 2011, subject to stated limitations on the scope of the representation.[14]

3  On June 7, 2011, the same day that this Court entered the Second Interim Employment

4  Order, the Court also held a final hearing on the GT Employment Application.[15] At the June 7

5  hearing, Judge Bruce T. Beesley of this Court inquired "Does anyone have objections to making

6  permanent the hiring of Greenberg Traurig with the restrictions set forth in the interim order?"[16]

7  After allowing the secured creditor MET to set forth its concerns, this Court ruled: "So noting

8  your objection, I will approve the employment of Greenberg Traurig subject to the various

9  restrictions which were reflected in the last interim order."[17]

10  On May 12, 2011, the Debtor filed an Application for Employment of Special Counsel of

11  Matthew L. Johnson, Esq., of the law firm of Matthew L. Johnson & Associates, P.C.

12  ("Johnson"), as Debtor's special counsel on discrete matters.[18] At a May 17, 2011 hearing, the

13  Johnson Employment Application was discussed including his representation of the Guarantors in

14  the Guarantor Action.[19]  At the June 7, 2011 hearing, this Court considered the Johnson

15  Employment Application, including potential conflicts of interest, including those with NSB.[20]

16  At the hearing, this Court ruled: "I am going to deny the application without prejudice with

17  respect to engaging Mr. Johnson to bring an action against the secured creditor or to investigate

18  claims against the secured creditor.  I am going to allow [the Johnson Employment Application]

19  with respect to [Johnson] acting as conflicts counsel."[21]

20

21

22  [14] Complaint ¶ 28 *& See Second Interim Order Authorizing Employment and Retention

23  of Greenberg Traurig, LLP, as Debtors Reorganization Counsel effective as of the Petition Date [Bankr. ECF No. 123] (the "Second Interim Employment Order").

24  [15] Transcript of June 7, 2011 Hearing [Bankr. ECF No. 141].

[16] Transcript of June 7, 2011 Hearing [Bankr. ECF No. 141] at p. 20 ll. 20-22.

25  [17] Transcript of June 7, 2011 Hearing [Bankr. ECF No. 141] at p. 21 ll. 9-11.

[18] Complaint ¶ 31 & Application for Employment of Special Counsel [Bankr. ECF No.

26  82] (the "Johnson Employment Application").

[19] See Transcript of May 17, 2011 Hearing [Bankr. ECF. No. 140] at pp. 4–8.

27  [20] See Transcript of June 7, 2011 Hearing [Bankr. ECF No. 141] at pp. 4–20.

[21] See Transcript of June 7, 2011 Hearing [Bankr. ECF No. 141] at pp. 19.

28  6

1

*The Settlement Agreement*

2    On September 8, 2011, the Court entered an Order approving a Settlement Agreement[22]

3  that resolved the dispute among the Debtor, the Debtor's equity interest owners, and MET "in its

4  entirety."[23]  The Order allowed the secured creditor to proceed to foreclosure on PCP's

5  mortgaged assets, while MET assumed or paid all of the estate's unsecured debts, made specified

6  payments to equity interest holders, and agreed to dismiss the Guaranty Action, releasing the

7  equity interest holders from their guarantees of the PCP debt to MET.[24]  The Settlement also

8  provided for GT to retain its pre-petition retainer, $66,719.57 as payment for fees incurred.[25]

9  This Court expressly retained jurisdiction over all matters relating to the Settlement Order: "This

10  Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from

11  or related to the implementation of this Order and the Settlement Agreement."[26]

12

*Approval of GT's Fees*

13    GT later applied for approval of fees of $96,907.50 and expenses of $925.13 for a total of

14  $97,832.63 in connection with the services provided to the Debtor.[27]  The GT Fee Application

15  and its supporting declaration covered and described the services GT had provided in the

16  bankruptcy case, from March 23, 2011 through August 31, 2011.[28]

17

18

19    [22] The Settlement Agreement was attached as Exhibit 1 to the Supplement to Motion for

20  Entry of An Order Approving the Settlement and Release Agreement with METJEMEI, LLC
Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure [Bankr. ECF. No. 181].

21    [23] Complaint ¶ 58 & *See* Order Granting Motion for Entry of An Order Approving the
Settlement and Release Agreement with METEJEMI, LLC Pursuant to Rule 9019 of the Federal

22  Rules of Bankruptcy Procedure [Bankr. ECF No. 185] (the "Settlement Order") at p. 2.
    [24] Complaint ¶ 50.

23    [25] Settlement Agreement § 2.5(b) (indicating that GT can retain its pre-petition retainer in

24  the amount of $66,719.57).  Although PCP indicates that Settlement allowed "GT to keep its pre-
petition retainer of $75,000," the  Complaint ¶ 50, there is no dispute that GT's fees and expenses

25  exceeded the retainer.  Complaint ¶ 58.
    [26] Settlement Order p. 2.

26    [27] Complaint ¶ 58 & First Interim Application for Compensation and Reimbursement of
Expenses for the Interim Fee Period Ending August 31, 2011 [Bankr. ECF No. 190] (the "GT Fee

27  Application").
    [28] Complaint ¶ 58 & GT Fee Application.

28

7

1    On November 9, 2011, *after* approving and entering the Settlement Order, the Court

2    approved the GT Fee Application.[29]  Because the source of payments to GT under the Settlement

3    Order – GT's original retainer of $66,719.57 was exhausted after this payment, GT never sought

4    payment of any other fees for its work on the bankruptcy case.

5        *Dismissal and Closing of Case*

6        On March 21, 2012, PCP sought to dismiss the Chapter 11 Case because "the Debtor's

7    property has been fully liquidated, and unsecured creditors have been paid in full. Debtor

8    respectfully submits that there is no reason to remain in bankruptcy and respectfully requests that

9    this Court dismiss the Debtor's bankruptcy."[30]  On May 1, 2012, the Chapter 11 Case was

10   closed.[31]

11       *The State Court Action*

12        On May 30, 2014, PCP filed a Complaint (the "Complaint") in the Nevada District Court

13   for the Eighth Judicial District (Clark County), Case No. A-14-701605-C, asserting that the

14   defendants committed legal malpractice in the services provided and not provided to PCP,

15   breached their fiduciary duty to PCP and breached the covenant of good faith and fair dealing (the

16   State Court Case").  A copy of the Complaint, served on Debtor's Counsel on June 5, is attached

17   hereto as Exhibit A.  Every aspect of the State Court Case is based upon Defendant's alleged

18   actions or inactions during the Chapter 11 Case.  In essence the Debtor's equity owners, having

19   obtained the benefits of the Settlement Agreement, now seek to enhance their return by

20   collaterally attacking the Settlement Order, by getting additional payments in another forum.

21       First, PCP asserts that the Debtor's Counsel committed malpractice because they failed to

22   properly make PCP management and equity owners aware of possible more favorable terms of a

23

24       [29] Complaint ¶ 60 & Order Approving the First Interim Application for Compensation and
25   Reimbursement of Expenses for the Interim Period Ending August 31, 2011 [Bankr. ECF No.
     197] (the "GT Fee Order").
26       [30] *See* Motion to Dismiss Bankruptcy [Bankr. ECF No. 207].  On April 6, 2012, this Court
     entered an Order dismissing the Chapter 11 Case as of March 31, 2012.  *See* Order Granting
27   Motion to Dismiss Bankruptcy [Bankr. ECF No. 212] & Complaint ¶ 63.
28       [31] *See* Bankr. ECF No. 216 ("Bankruptcy Case Closed").

plan of reorganization. This alleged poor bankruptcy advice led PCP to conclude that it had no other option "than a voluntary 'give up' settlement of its Property," Complaint ¶ 67.a) -- the very Settlement Agreement that this Court approved after *specifically considering* whether this was a good deal for the estate.[32] Many of the alleged failures by Debtor's Counsel indicate that the Bankruptcy Court would have made favorable findings for PCP. The issue of whether the Settlement Agreement was a good deal for PCP was specifically decided by this Court and this Court is in a far better position to determine what plan of reorganization terms might or might not have been acceptable to it than the State Court. Specifically, PCP asserts that Debtor's Counsel:

> i.     Advised that Park Central's principals would have to invest at least $2 million of "new value" "which would be at-risk and potentially be lost in the event a plan or [sic] reorganization was not approved." Complaint at ¶¶ 42 & 67.a).

> ii.    Failed to discuss or analyze with PCP that MET might make an election under Bankruptcy Code §1111(b) and, whether or not the election was made, that MET's claim could be "modified, deferred and 'stretched out' under a proposed plan." Complaint ¶¶ 43, 44, 67.b), and 67.c).

> iii.   Failed to discuss that, if MET did not make a § 1111(b) election, MET's deficiency claim could have been bifurcated and separately classified from other general unsecured trade claims. Complaint ¶¶ 44 & 67.c).

> iv.    Failed to discuss or analyze with PCP that the repayment terms to MET could be substantially altered, including such terms as 10 years of "interest only" with such payments calculated on 20 or 30 years amortization schedule. Complaint ¶¶ 45 & 67.d).

---

[32] Although Debtor's Counsel refer to certain of the allegations in the Complaint in this Motion to Reopen, Debtor's Counsel' responses are limited to the context of this Motion to Reopen and do not attempt to respond to the truth of the assertions. Debtor's Counsel reserve the right to contest any factual or legal assertions set forth in the Complaint.

9

1

2

3

      v.     Failed to discuss or analyze the possibility of imposing a cramdown interest rate equal to the prime rate of interest plus 1% to 3% as part of a plan of reorganization. Complaint ¶¶46 & 67.e).

4

5

6

7

8

      vi.     Failed to discuss or analyze other mechanisms for a plan of reorganization to lessen the burden such as (a) periodic future sales, (b) "new value" contributions less than $2 million, (c) future appreciation of the property, (d) increased income from greater occupancy or (e) that a plan of reorganization could have served as a "bridge" until the property and rental markets improved. Complaint ¶¶47, 48, 67.f) & 67.g).

9

10

11

12

13

14

15

Debtors' Counsel will show that many of these allegations are flatly contradicted by written communications to PCP. But even if one assumes arguendo Plaintiff's allegations, there can be no question that claims about advice provided in connection with the potential terms of a plan of reorganization arise from the Debtor's Counsel services provided as part of the Chapter 11 Case. Moreover, each alleged failure is based upon the assumption that this Bankruptcy Court would have approved the proposed term. This Bankruptcy Court should make that determination. A State Court should not decide what this Bankruptcy Court would have found acceptable.

16

17

18

19

     Second, PCP asserts that it was harmed based upon Defendant's employment and failure to disclose conflicts. These allegations seek to revisit the Bankruptcy Court's approval of GT's employment under §327(e) and approval of GT's fees and the Court's resolution of conflicts issues. Specifically, PCP asserts the following:

20

21

22

23

24

25

26

      i.    Debtor's Counsel committed malpractice in assigning Olson to handle and oversee the Chapter 11 Case, despite Olson's purported lack of experience representing debtors in bankruptcy proceedings and lack of experience with single-asset real estate debtors in particular. Complaint ¶¶ 18 & 67.h). Yet, as noted above, this Court approved Employment of (and subsequently fees for the services provided by) Mr. Olson and GT based on its assessment of Mr. Olson's capabilities and those of GT. These allegations seek to collaterally attack those Court findings and Orders.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii. Debtor's Counsel breached its fiduciary duty to PCP in failing to "make full written disclosure of conflicting interests of Park Central and to obtain Park Central's informed written consent, in violation of, inter alia, Nevada Rules of Professional Conduct Rule 1.7, 1.8, and/or 1.9" Complaint ¶ 74.a). Specifically, PCP asserts that GT failed to disclose its previous representation of NSB. Complaint ¶ 25. These allegations of non-disclosure seek to reconsider the Court's findings and Orders regarding GT's employment. GT disclosed conflicts of interest in the GT Employment Application, ¶¶ 20-23, Olson Declaration in Support thereof, ¶¶ 14-22. Potential conflicts were also discussed with the Bankruptcy Court on April 14, 2011, see Transcript of April 14, 2011 Hearing [Bankr. ECF No. 155] at pp. 5-6, and May 17, 2011, see Transcript of May 17, 2011 Hearing [Bankr. ECF. No. 140] at pp. 10-15. The allegations in the Complaint essentially asks the State Court to find that GT's Employment Application was inadequate and that the Court would have found that the scope of GT's representation made it adverse to NSB and that NSB was a client. These are issues properly before this Court.

iii. Debtor's Counsel (i) abused the estate's trust and confidence by favoring the interest of NSB and others over the legal rights and interests of PCP, Complaint ¶ 73, and (ii) failed to put PCP's interests ahead of their own and engaged in self-dealing when they did not advise PCP of the desirability or indeed even the possibility of seeking the advice of independent legal counsel in connection with the Settlement Agreement, including as it related to GT Debtor's Counsel retention of their retainer, and in connection with GT Debtor's Counsel' Fee Application. Complaint ¶ 74.d). Again, this allegation seeks to undermine the Bankruptcy Court's GT Fee Order and its Order approving the Settlement agreement. And PCP is alleging grossly inappropriate behavior – untrue – by a §327 professional, another province of this Court's authority.

11

1    Third, PCP asserts that it was harmed by Debtor's Counsel's actions with respect to the

2    employment of Mr. Johnson, Debtor's special counsel. These allegations seek to revisit the

3    Bankruptcy Court's proceedings regarding the potential employment of Mr. Johnson.

4    Specifically, PCP asserts that the Debtor's Counsel committed malpractice because Debtor's

5    Counsel proposed the retention of Johnson as special counsel despite the fact that Johnson already

6    represented NSB in other unrelated litigation as a current client, which said retention would

7    involve violation of Nevada Rules of Professional Conduct 1.7 and 1.8(b). Complaint ¶ 67.i).

8    However, this potential conflict was discussed extensively with the Bankruptcy Court on May 17,

9    2011 and June 7, 2011. *See* Transcript of May 17, 2011 Hearing [Bankr. ECF. No. 140] at pp.

10   14-16; Transcript of June 7, 2011 Hearing [Bankr. ECF. No. 141] at pp. 4-20.

11                                   **RELIEF REQUESTED**

12    Debtor's Counsel respectfully seek entry of an order reopening the Chapter 11 Case so

13   that the Court may then remove the State Court Action pursuant to Debtor's Counsel's Notice of

14   Removal. Debtor's Counsel have separately filed a Notice of Removal, which may be amended

15   as appropriate upon the Court's reopening of the bankruptcy case.

16                                   **BASIS FOR RELIEF**

17
18   **I.    THE COURT SHOULD REOPEN THE CHAPTER 11 CASE FOR THE PURPOSE
          OF ADJUDICATING THE STATE COURT ACTION**

19    This Court clearly has the power to reopen the case to resolve this dispute. Section

20   350(b) of the Bankruptcy Code provides that "[a] case may be reopened in the court in which

21   such case was closed to administer assets, to accord relief to the debtor, or for other cause." 11

22   U.S.C. § 350(b). *See also* Fed. R. Bank. P. 5010. According to the Advisory Committee Notes to

23   the 1991 Amendments to Bankruptcy Rule 3022, "[a] final decree closing the case . . . does not

24   deprive the court of jurisdiction to enforce or interpret its own orders and does not prevent the

25   court from reopening the case for cause pursuant to § 350(b) of the Code." 9 Collier on

26   Bankruptcy App. 3022[2] (16th Ed. 2013).

27

28                                         12

1    It is well-settled that a "motion to reopen is simply a mechanical device which can be

2  brought ex parte and without notice. *In re Abott*, 183 B.R. 198, 200 (B.A.P. 9th Cir. 1995).

3  Indeed, "[n]othing concerning the merits is considered when the motion is granted." *In re*

4  *Daniels*, 34 B.R. 782, 784 (9th Cir. BAP 1983).[33]

5    The key consideration for the Court in deciding to reopen to allow removal of a state court

6  case is whether removal is appropriate, i.e., whether jurisdiction exists over the matter for which

7  the case will be reopened. *See, e.g., In re Hofman*, 248 B.R. 79, 89, fn. 19 (Bankr. W.D.Tex.

8  2000) ("The court looking at [a motion to reopen] might well ask whether it would indeed be

9  appropriate to reopen in order to entertain a removal petition, in effect reaching the question

10  whether the federal forum should properly be made available to the defendant."); *In re Earned*

11  *Capital Corp.*, 331 B.R. 208, 217 (Bankr. W.D. Pa. 2005) (directing the Clerk to reopen the case

12  to allow removal of state court action against estate professionals because "these matters that

13  have a significant connection with the administration of the case can be addressed.").

14    This Court plainly has jurisdiction of the claims in the State Court Action on two separate

15  bases. First, this Court has exclusive jurisdiction of all matters relating to the retention, services,

16  and payment of section 327 professionals under new 28 U.S.C. §1334(e)(2).  Second, this Court

17  has also long had jurisdiction over matters relating to its orders or to malpractice actions relating

18  to estate professionals under 28 U.S.C.§1334(b).  Indeed, this Court expressly retained

19  jurisdiction over the Settlement Order under this authority.

20

21

22

23    [33]    While it is not necessary to decide the merits of the claims at this juncture,
Debtor's Counsel will demonstrate that the Court's prior orders approving GT's employment and

24  fees act as "*res judicata* as to any subsequent claims for malpractice or misconduct as to work
performed under the supervision of the Court" and should act to bar all claims alleged in the State

25  Court Action.  *In re Earned Capital Corp.*, 331 B.R. 208, 216 (Bankr. W.D. Pa. 2005) (citing
cases and affirmed by *In re Seven Fields*); *see also In re Iannochino*, 242 F.3d 36 (1st Cir. 2001)

26  (finding fee award that effectively "determines all of the compensation owed to an attorney under
section 330 may be considered final" for *res judicata* purposes and that determination "depends

27  on the circumstances of the case").

28                                      13

1    Section 1334(e)(2), enacted in the 2005 Amendments, grants this Court exclusive

2    jurisdiction "over all claims or causes of action that involve construction of section 327," under

3    which the bankruptcy estate employs professionals. This Court appointed Olson and GT as

4    Debtor's Counsel pursuant to section 327. Since enactment of 1334(e)(2), "[s]uits against court-

5    approved professionals [such as the State Court Action] will now be heard in the bankruptcy

6    court." Michael L. Cook, Bankruptcy Litigation Manual, §1.03[D] at 1-58 (2013-14 rev. ed.).

7    Section 1334(e)(2) alone provides a dispositive basis for the Court to reopen the bankruptcy

8    proceeding so that the Court may remove and resolve the State Court Action, which seeks to

9    revisit the employment of Olson and GT, whom this Court appointed as §327 professionals.

10    There is a second dispositive basis on which this Court may reopen the bankruptcy

11    proceeding. It has long been established that 28 U.S.C. §1334(b) gives federal courts original

12    jurisdiction over "all civil proceedings *arising under Title 11, or arising in or related to cases*

13    *under Title 11*." 28 U.S.C. § 1334(b).

14    Pursuant to this provision, this Court expressly retained jurisdiction over all matters

15    addressed in that Settlement Order that effectively ended the PCP bankruptcy. The State Court

16    Action seeks to reopen many aspects of the Settlement. The compensation to Debtor's Counsel,

17    of course, was one aspect of that Settlement Order. But the Debtor alleges that the compensation

18    to which its management and its equity owners agreed was inadequate and that *this Court would*

19    *have awarded PCP higher recoveries had the case continued.* As set forth above, PCP asserts

20    that the poor advice of Debtor's Counsel led Debtor to believe it had no choice but to accept the

21    Settlement Agreement. PCP asserts that had those plan options been discussed it might have

22    pursued a plan of reorganization. PCP is arguing that a plan of reorganization was a better option

23    for the estate and the Settlement Agreement was not in the best interests of the estate. Therefore,

24    according to PCP, the Settlement Agreement should not have been approved because a plan of

25    reorganization was in the best interest of the estate. Of course, this Court was presented with the

26    Settlement Agreement and expressly presented with the question of whether it was fair and

27    equitable to the creditors, reasonable under the circumstances and in the best interests of the

28

14

1  estate. *See In re Warren*, 2011 WL 3299819, *5 (9th Cir. BAP 2011) (further explaining that the

2  fairness and equity of a settlement is evaluated based upon (a) the probability of success in the

3  litigation; (b) the difficulties, if any to be encountered in the matter of collection, (c) the

4  complexity of the litigation involved, and the expense, inconvenience and delay necessarily

5  attending it, and (d) the paramount interest of creditor and a proper deference to their reasonable

6  views in the premise).   Through the plaintiff, the equity owners are essentially seeking to oppose

7  the motion to approve the Settlement Agreement *post hoc*.  The Court is in the best position to

8  pass on such allegations and to determine whether its Settlement Order was ill-conceived.  It

9  speaks volumes that the Debtor is not returning to this Court for relief from the Settlement Order,

10  but rather is seeking to revisit the Order in a court unfamiliar with the prior proceedings in this

11  case and with a debtor's realistic options in bankruptcy.

12       A civil proceeding "arises under" Title 11 when it involves a "cause of action created or

13  determined by a statutory provision of [T]itle 11."  *In re Harris Pines Mills*, 44 F.3d 1431, 1435

14  (9th Cir. 1995) (citing *In re Wood*, 825 F.2d 90, 96-97 (5th Cir. 1987)); *In re Eastport Assocs.*,

15  935 F.2d 1071, 1076-77 (9th Cir. 1991) (same).  A civil proceeding gives rise to "arising in"

16  jurisdiction if the proceeding is "not based on any right expressly created by title 11, but

17  nevertheless, would have no existence outside of the bankruptcy." *Id.*

18       Thus, "claims that arise under or in Title 11 are deemed to be 'core' proceedings, while

19  claims that are related to Title 11 are 'noncore' proceedings. *Id.* (citing *In re Int'l Nutronics*, 28

20  F.3d 965, 969 (9th Cir. 1994)).  The State Court Action gives rise to core jurisdiction for multiple

21  reasons.

22       First, courts in the Ninth Circuit have consistently recognized that postpetition claims

23  against court-appointed professionals for alleged malpractice in actions relating to the bankruptcy

24  estate are subject to a bankruptcy court's arising "under" or "in" jurisdiction.  *In re Harris Pine

25  Mills*, 44 F.3d 1431, 1437 (9th Cir. 1995) (upholding refusal to remand and finding "postpetition

26  state law claims asserted by or against a trustee in bankruptcy or the estate's agents for conduct

27  arising out of the sale of property belonging to the estate qualify as core proceedings"); *In re*

28

15

1   *Ferrante*, 51 F.3d 1473, 1476 (9th Cir. 1995) (finding core jurisdiction over claim against

2   bankruptcy trustee for embezzlement as claim involved "the very bankruptcy process itself"); *In*

3   *re Cho*, 9 Fed. Appx. 633, 2001 WL 521322, *1 (9th Cir. 2001) (finding removal of state court

4   action for malpractice against law firm acting as bankruptcy counsel proper because it was a core

5   proceeding involving alleged misconduct "inextricably intertwined" with administration of the

6   bankruptcy estate); *In re Kahlenberg Lumber Co., Inc.*, 103 F.3d 138, 1996 WL 673950, *2 (9th

7   Cir. 1996) (upholding exercise of jurisdiction over malpractice claim which gave rise to core

8   jurisdiction); *In re Diversified Contract Services,* 167 B.R. 591, 597-98 (Bankr. N.D. Cal. 1994)

9   (retaining jurisdiction over removed state-law malpractice claim and finding that "a bankruptcy

10  court is best positioned to determine claims based on an alleged breach of duty by an attorney

11  appointed by the bankruptcy court to represent a bankruptcy trustee").[34]

12          The State Court Action arises "under" and "in" Title 11. Plaintiff's allegations all center

13  on alleged malpractice in connection with work that Debtor's Counsel performed during the

14  Debtor's bankruptcy case, with this Court's approval and for which this Court approved

15  compensation. Indeed, the State Court Action, by its nature, could arise only in the context of a

16  bankruptcy case under bankruptcy law. As discussed above, a large portion of the Complaint

17  asserts that the Debtor's Counsel failed to provide adequate advice regarding possible terms for a

18  plan of reorganization. Only a bankruptcy court can consider what terms are appropriate for a

19

20          [34] Numerous courts in other jurisdictions likewise have held that post-petition malpractice
21  claims against court-approved professionals give rise to core jurisdiction. *See, e.g. In re V&M
    Management, Inc.*, 321 F.3d 6, 7-8 (1st Cir. 2003) ("[W]e have little difficulty in finding that the
22  fraud and malpractice claims [against court appointed professionals] arise under or in Title 11 or
    relate to a case under Title 11"); *Baker v. Simpson*, 613 F.3d 346, 352 (2d Cir. 2010) (holding that
23  state-law malpractice claims that "derive from services rendered in connection with [the debtor's]
    Title 11 proceeding in the bankruptcy court, fall within the scope of that court's 'arising in'
24  jurisdiction"); *In re Seven Fields Dev. Corp.,* 505 F.3d 237, 259-62 (3d Cir. 2007) (holding that
25  state-law malpractice claims "based on services provided during the bankruptcy, under the
    supervision of, and subject to the approval of, the bankruptcy court" fall within bankruptcy
26  court's "arising in" jurisdiction); *Grauz, M.D. v. Englander*, 32 F.3d 467, 471-72 (4th Cir. 2003)
    ("[M]alpractice claim against court-appointed professional for work which originated in the
27  bankruptcy case, is a claim 'arising in' the bankruptcy case."); *In re Southmark Corp.*, 163 F.2d
28  925, 932 (5th Cir. 1999).

16

1  plan of reorganization. Only a bankruptcy court can determine appropriate modifications to

2  payment terms, including interest rate and amortization of a secured debt. In asserting that

3  Debtor's Counsel failed to analyze and discuss numerous plan options with PCP, PCP assumes

4  that the Bankruptcy Court would have approved the terms they allege were not discussed.

5  However, PCP seeks to have a State Court determine what this Bankruptcy Court would have

6  considered and/or approved. This Court is in the best position to determine what, if any, of the

7  proposed options might have been approved. Further, in asserting that a plan of reorganization

8  was a better option, PCP is arguing that the Settlement Agreement was not in the best interests of

9  the estate and should not have been approved. PCP is seeking to relitigate the very question

10  before the Court when it approved the Settlement Order.

11        Moreover, a case involving the interpretation or enforcement of a bankruptcy court order

12  qualifies as a case arising "under" or "in" Title 11. *In re Taylor*, 884 F.2d 478, 481 (9th Cir.

13  1989) (citing *In re Franklin*, 802 F.2d 324, 326-27 (9th Cir. 1986)); *see also Kenwanee Boiler*

14  *Corp.*, 270 B.R. 912, 917 (Bankr. N.D. Ill. 2002) (explaining "bankruptcy courts have core

15  jurisdiction to interpret and enforce their orders; *In re Newstar Energy of Tex., LLC*, 280 B.R.

16  623, 624 (Bankr. W.D.Mich. 2002); *In re Williams*, 256 B.R. 885, 892 (B.A.P. 8th Cir. 2001)

17  ("[T]he enforcement of orders resulting from core proceedings are themselves considered core

18  proceedings"); *Matter of Weber*, 25 F.3d 413, 416 (7th Cir. 1994); *In re Cooley*, 88 B.R. 788, 789

19  (Bankr. S.D. Tex. 1988) ("[R]esolution turn[ing] on the interpretation of a prior court order,

20  which in turn interpreted and applied a specific provision of Title 11 . . . is a core

21  proceeding . . . .").

22        Here, the State Court Action arises "under" and "in" Title 11 because Plaintiff is

23  challenging and seeking to revisit the Settlement Order, the GT Fee Order, the First Interim

24  Employment Order, the Second Interim Employment Order and the Court's oral order at the

25  hearing on June 7, 2011. Debtor's Counsel's employment was approved by this Court and

26  Debtor's Counsel performed services for the Debtor under the supervision of this Court and in

27  connection with that employment. Debtor now suggests that Debtor's Counsel were not qualified

28

17

1  to be a debtor's counsel. As noted above, PCP asserts, among other things that Debtor's Counsel

2  failed to disclose certain conflicts to the Bankruptcy Court, failed to provide adequate advice

3  regarding plan options, acted contrary to the Debtor's interests and caused harm by seeking the

4  employment of Mr. Johnson on a delayed schedule. The Bankruptcy Court approved GT's

5  employment, after consideration of certain possible conflicts. This Court approved award of

6  GT's fees and expenses after considering the services provided to PCP. Plaintiff now seeks to

7  have another court determine that Debtor's Counsel were not entitled to fees and expenses that

8  this Court approved for GT's services.

9      This Court approved a settlement that lifted the stay against MET's foreclosure in

10  exchange for full assumption or payment of the unsecured creditors, payment of commissions to

11  equity interest holders, and release of the equity holders' guarantees. Plaintiff, controlled by the

12  equity holders, seeks to prove that the Settlement Order shortchanged the equity holders and that,

13  if a different bankruptcy strategy had been pursued, this Court would have compelled a plan of

14  reorganization that gave them far more. Indeed, the plaintiff seeks to persuade the state court that

15  the equity interest holders could have maintained their ownership of assets $5 million under water

16  while making no capital contribution. In short, the State Court Action turns on the interpretation

17  of the Bankruptcy Court's Orders and rulings regarding the employment and compensation of

18  Defendant and the fairness of the Settlement Order.

19      Courts in the Ninth Circuit have consistently refused to abstain from or remand

20  malpractice claims that arise solely in the context of a bankruptcy case to state court. *In re Harris*

21  *Pine Mills*, 44 F.3d 1431, 1437 (9th Cir. 1995) (upholding refusal to remand postpetition state

22  law professional malpractice claim); *see also In re Diversified Contract Services, Inc.*, 167 B.R.

23  at 596-98 (denying motion to remand and abstain because the bankruptcy court was "best

24  positioned to determine claims based on an alleged breach of duty by an attorney appointed by

25  the bankruptcy court to represent a bankruptcy trustee" where the claims involved bankruptcy law

26  issues that were "difficult and important"). As discussed above, PCP alleges that the Debtor's

27  Counsel failed to discuss various plan options and as a result of that failure, PCP was forced to

28

18

enter into the Settlement Agreement. The Bankruptcy Court is in the best position to determine claims based upon Debtor's Counsel' alleged failure to discuss specific alternative plan options. The State Court would lack the background regarding this case and bankruptcy cases in general to determine the viability of the proposed alternative plan options. Only an experienced Bankruptcy Court can determine:

(i) Whether the Bankruptcy Court would have approved a proposed plan of reorganization that sought to "substantially alter repayment terms of an existing claim, including such terms a 10-year period of "interest only" payments on the total indebtedness, with such payments being calculated on a 20 or 30 year amortization schedule" where there was no Complaint ¶¶45, 67.d);

(ii) Whether the Bankruptcy Court would have also approved a "discount rate or 'cramdown interest rate' at a market rate on such a modified repayment obligation under a confirmed plan that would be subject to a market test equal to the prime rate of interest plus a risk adjustment generally ranging from 1%-3%." Complaint ¶¶ 46 67.e);

(iii) Whether the Bankruptcy Court would have approved a plan of reorganization based on "future appreciation of the Property over time . . ." Complaint ¶¶ 47 & 67.f).

(iv) Whether the Bankruptcy Court would have approved a plan of reorganization based upon a speculation of "increased income from greater occupancy of the Property over time . . ." Complaint ¶¶47 & 67.f).

(v) Whether the Bankruptcy Court would have approved a plan of reorganization based upon speculative "future sale of certain parcels of the Property, and after they had appreciated with the passage of time and appropriate buyers had been found. . ." Complaint. ¶¶47 & 67.f).

In a case where all unsecured debt was paid, all of these allegations are to make the state court believe that the equity interest holders would have done better in the bankruptcy. Through the plaintiff, the equity owners are seeking to relitigate the case before a State Court with no bankruptcy experience. Plaintiff, with the benefit of hindsight about market changes, seeks to

19

1    take this case to another judge to undermine the decisions made at the time, based upon the facts

2    as they existed.  The Bankruptcy Court should not condone this attempt.  The allegations raise

3    complex and important bankruptcy questions that should remain with the Bankruptcy Court.

4         The Bankruptcy Court has expressly retained jurisdiction over the interpretation and

5    enforcement of those orders and rulings and this retention is entirely consistent with 28 U.S.C.

6    §1334(b).  Pursuant to Local Rule 5010, Debtor's Counsel is unaware of any fees that remain

7    unpaid and owing in the original case.

8    **II.    CONCLUSION**

9         Debtor's Counsel requests that this Court grant the motion to reopen on an expedited basis

10   so that the removal and adjudication of the State Court Action may proceed without delay.

11   Movants note that a motion to reopen may be granted ex parte and even without notice to other

12   parties in interest.  *In re Abott*, 183 B.R. 198, 200 (B.A.P. 9th Cir. 1995); *In re Daniels*, 34 B.R.

13   782, 784 (B.A.P. 9th Cir. 1983).

14

15        Movants are filing for removal simultaneously with their motion to reopen and will file an

16   amended notice of removal if and when the case is reopened, a procedure the Ninth Circuit has

17   described approvingly in similar circumstances.  *See In re Cho*, 9 Fed. Appx. 633, 2001 WL

18   521322, *1 (9th Cir. 2001) (unreported) (finding removal of state malpractice claim was proper

19   because counsel "filed an amended notice of removal five days after the bankruptcy court

20   reopened the case.").

21   ///

22   ///

23

24

25

26

27

28                                  20

**WHEREFORE**, Debtor's Counsel respectfully request that the Court enter an order reopening the Chapter 11 Case for the limited purpose of adjudicating the State Court Action and grant such other and further relief as is just and proper.

Dated: June 9, 2014

Respectfully submitted,

**STEPTOE & JOHNSON LLP**
FILIBERTO AGUSTI (*pro hac vice forthcoming*)
JOSHUA R. TAYLOR (*pro hac vice forthcoming*)
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067-5052

**RICE REUTHER SULLIVAN & CARROLL, LLP**
DAVID A. CARROLL (NSB # 7643)
ANTHONY J. DIRAIMONDO (NSB# 10875)
3800 Howard Hughes Parkway, Suite 1200
Las Vegas, Nevada 89169

*Counsel for Debtor's Counsel*
*GREENBERG TRAURIG, LLP and*
*BOB L. OLSON*

MOTION OF GREENBERG TRAURIG, LLP AND BOB L. OLSON FOR EXPEDITED ORDER UNDER SECTION 350 OF THE BANKRUPTCY CODE REOPENING CHAPTER 11 CASE

# EXHIBIT "A"

CIVIL COVER SHEET    A-14-701605-C

Clark County, Nevada

Case No. _____

*(Assigned by Clerk's Office)*

XXX

## I. Party Information

| | |
|---|---|
| Plaintiff(s) (name/address/phone):<br>Park Central Plaza 32, LLC<br>c/o Robert A. Rabbat, Esq.<br>ENENSTEIN & RIBAKOFF<br>3960 Howard Hughes Parkway, Suite 500<br>Las Vegas, NV 89169<br>(702) 468-0808 | Defendant(s) (name/address/phone):<br>Greenberg Traurig, LLP<br>3773 Howard Hughes Parkway, Suite 400<br>Las Vegas, NV 89169<br><br>Bob L. Olson<br>(address unknown at time of filing) |
| Attorney (name/address/phone):<br>Robert A. Rabbat, Esq.<br>ENENSTEIN & RIBAKOFF<br>3960 Howard Hughes Parkway, Suite 500<br>Las Vegas, NV 89169<br>(702) 468-0808<br>Attorneys for Park Central Plaza 32, LLC | Attorney (name/address/phone):<br>Filiberto Agusti<br>STEPTOE & JOHNSON LLP<br>1330 Connecticut Avenue, NW<br>Washington, D.C. 20036<br>(202) 429-6428<br>Attorneys for Greenberg Traurig, LLP |

**II. Nature of Controversy** (Please check applicable bold category and applicable subcategory, if appropriate)

☐ Arbitration Requested

| Civil Cases | |
|---|---|
| **Real Property** | **Torts** |

| Real Property | Torts | |
|---|---|---|
| ☐ **Landlord/Tenant**<br>  ☐ Unlawful Detainer<br>☐ **Title to Property**<br>  ☐ Foreclosure<br>  ☐ Liens<br>  ☐ Quiet Title<br>  ☐ Specific Performance<br>☐ **Condemnation/Eminent Domain**<br>☐ **Other Real Property**<br>  ☐ Partition<br>  ☐ Planning/Zoning | **Negligence**<br>☐ **Negligence – Auto**<br>☐ **Negligence – Medical/Dental**<br>☐ **Negligence – Premises Liability**<br>    (Slip/Fall)<br>☒ **Negligence – Other** | ☐ **Product Liability**<br>  ☐ Product Liability/Motor Vehicle<br>  ☐ Other Torts/Product Liability<br>☐ **Intentional Misconduct**<br>  ☐ Torts/Defamation (Libel/Slander)<br>  ☐ Interfere with Contract Rights<br>☐ **Employment Torts** (Wrongful termination)<br>☐ **Other Torts**<br>  ☐ Anti-trust<br>  ☐ Fraud/Misrepresentation<br>  ☐ Insurance<br>  ☐ Legal Tort<br>  ☐ Unfair Competition |

| Probate | Other Civil Filing Types | |
|---|---|---|
| **Estimated Estate Value:** _____<br>☐ **Summary Administration**<br>☐ **General Administration**<br>☐ **Special Administration**<br>☐ **Set Aside Estates**<br>☐ **Trust/Conservatorships**<br>  ☐ Individual Trustee<br>  ☐ Corporate Trustee<br>☐ **Other Probate** | ☐ **Construction Defect**<br>  ☐ Chapter 40<br>  ☐ General<br>☐ **Breach of Contract**<br>  ☐ Building & Construction<br>  ☐ Insurance Carrier<br>  ☐ Commercial Instrument<br>  ☐ Other Contracts/Acct/Judgment<br>  ☐ Collection of Actions<br>  ☐ Employment Contract<br>  ☐ Guarantee<br>  ☐ Sale Contract<br>  ☐ Uniform Commercial Code<br>☐ **Civil Petition for Judicial Review**<br>  ☐ Foreclosure Mediation<br>  ☐ Other Administrative Law<br>  ☐ Department of Motor Vehicles<br>  ☐ Worker's Compensation Appeal | ☐ **Appeal from Lower Court** (also check applicable civil case box)<br>  ☐ Transfer from Justice Court<br>  ☐ Justice Court Civil Appeal<br>☐ **Civil Writ**<br>  ☐ Other Special Proceeding<br>☐ **Other Civil Filing**<br>  ☐ Compromise of Minor's Claim<br>  ☐ Conversion of Property<br>  ☐ Damage to Property<br>  ☐ Employment Security<br>  ☐ Enforcement of Judgment<br>  ☐ Foreign Judgment – Civil<br>  ☐ Other Personal Property<br>  ☐ Recovery of Property<br>  ☐ Stockholder Suit<br>  ☐ Other Civil Matters |

**III. Business Court Requested** (Please check applicable category; for Clark or Washoe Counties only.)

| | | |
|---|---|---|
| ☐ NRS Chapters 78-88<br>☐ Commodities (NRS 90)<br>☐ Securities (NRS 90) | ☐ Investments (NRS 104 Art. 8)<br>☐ Deceptive Trade Practices (NRS 598)<br>☐ Trademarks (NRS 600A) | ☐ Enhanced Case Mgmt/Business<br>☐ Other Business Court Matters |

| May 30, 2014 | /s/ Robert A. Rabbat, Esq. |
|---|---|
| Date | Signature of initiating party or representative |

Electronically Filed
05/30/2014 02:47:09 PM

**CLERK OF THE COURT**

**COMP**
Robert A. Rabbat, Esq.
Nevada Bar # 12633
**ENENSTEIN & RIBAKOFF**
3960 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone: (702) 468-0808
Facsimile: (702) 920-8228
Email: rrabbat@enensteinlaw.com
Attorneys for Plaintiff Park Central Plaza 32, LLC

# EIGHTH JUDICIAL DISTRICT COURT
## CLARK COUNTY, NEVADA

| | |
|---|---|
| PARK CENTRAL PLAZA 32, LLC, a Nevada limited liability company; <br><br> Plaintiff, <br> v. <br><br> GREENBERG TRAURIG, LLP, a New York limited liability partnership; BOB L. OLSON, an individual; DOES I through X, inclusive; ROE BUSINESS ENTITIES I through X, inclusive, <br><br> Defendants. | CASE NO. A-14-701605-C <br><br> DEPT. NO.   XXX <br><br> **COMPLAINT FOR:** <br> 1. **Legal Malpractice** <br> 2. **Breach of Fiduciary Duty** <br> 3. **Breach of Covenant of Good Faith and Fair Dealing** <br><br> **(Exempt from Arbitration: Amount in controversy exceeds $50,000.00)** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Park Central Plaza 32, LLC, a Nevada limited liability company, by and through its counsel, Robert A. Rabbat, Esq., of the law firm Enenstein & Ribakoff, hereby complains and alleges against the above-named Defendants as follows:

## I.    THE PARTIES, JURISDICTION AND VENUE

1.    Plaintiff, PARK CENTRAL PLAZA 32, LLC (hereinafter "Park Central"), was at all times mentioned herein, a Nevada limited liability company duly organized pursuant to the

laws of the State of Nevada and authorized to do business in Clark County, Nevada.

2.     Defendant, GREENBERG TRAURIG, LLP (hereinafter "Defendant" or "GT"), was at all times mentioned herein a New York limited liability partnership duly organized pursuant to the laws of the State of New York and authorized to do business in Clark County, Nevada.

3.     Defendant BOB L. OLSON ("Olson", and together with GT, the "GT Defendants") was at all times mentioned herein an individual residing in Clark County, Nevada, and licensed by the State Bar of Nevada to practice law in the State of Nevada, Bar No. 3783.

4.     Park Central does not know the true names of the individuals, corporations, partnerships and entities sued and identified in fictitious names as DOES I through X and ROE BUSINESS ENTITIES I through X, inclusive.  Park Central alleges that such Defendants are responsible for damages suffered by Park Central as more fully discussed under the claims set forth below.  Park Central will request leave of this Honorable Court to amend this Complaint to show the true names and capacities of each such fictitious Defendants at such time Park Central discovers such information.

5.     Venue is proper in this Court pursuant to NRS 13.040, in that this is the county in which the subject real property lies, where the legal malpractice occurred, where the breach of duty occurred, and where the breach of contract occurred.

## II.     GENERAL ALLEGATIONS

**A.     Park Central's Loans and Events Occurring Prior to Park Central's Chapter 11 Bankruptcy Case**

6.     Park Central was the owner of real property and related improvements (collectively, the "Property") consisting of approximately 32 acres located in the City of North

Las Vegas, Clark County, Nevada, being APNs 124-25-312-003 and -004. The Property is located on the southeast corner of East Tropical Parkway and Losee Road, and at the northeast corner of East Ann Road and Losee Road.

7.      The Property was originally part of a larger parcel containing a total of approximately 26.65 net acres; however, that larger parcel was subdivided into three parcels of approximately 3.65 net acres, 4.56 net acres, and 18.44 net acres, respectively. In January 2006, the 4.56 net acre parcel was sold to Wal-Mart Stores, Inc., and the two remaining parcels were still owned by Park Central during the pendency of its Chapter 11 Case (as hereinafter defined)

8.      As of the Petition Date (as hereinafter defined), the Property had been improved with the following: (a) six multi-tenant retail buildings that total 54,805 square feet; (b) an existing vacant bar/tavern building that is 6,600 square feet; (c) four leased pad sites that are ground leased to Terrible Herbst for a proposed gas station and convenience store, a Kentucky Fried Chicken fast food outlet, a McDonald's fast food outlet, and Wells Fargo Bank; and (d) twelve (12) vacant, finished pad sites.   The seven (7) existing buildings consist of approximately 61,405 square feet (54,805 square feet in the six multi-tenant retail structures plus 6,600 square feet in the vacant bar/tavern structure).

9.      On February 10, 2004, Nevada State Bank ("NSB"), as lender, and Park Central, as borrower, entered into an Acquisition and Development Loan Agreement (as amended, the "Loan Agreement"), for a loan (the "Loan") in the original principal amount of $5,931,000 (this and all other indebtedness owing under the Loan, the "Indebtedness"). The Loan is evidenced by a Promissory Note dated February 10, 2004, which provided for a maturity date of August 3, 2005.

10.      Also on February 10, 2004, and in order to secure repayment of the

Indebtedness, NSB obtained a Deed of Trust and Security Agreement with Assignment of Rents and Fixture Filing (as modified, the "Deed of Trust") on Park Central's Property, which was recorded on February 13, 2013 in the Official Records of the Clark County, Nevada Recorder's Office (the "Official Records") as Instrument No. 20040213-0001941.

11.    The Loan was personally guaranteed by Crest Ridge, LLC, a Nevada limited liability company, Infinity Enterprise Investments LLC, Juli Koentopp, Kevin Spilsbury, and Brian Spilsbury (collectively, the "Guarantors") pursuant to various personal guaranties (collectively, the "Guaranties") dated as of February 10, 2004 and January 15, 2007.

12.    On December 8, 2005, January 15 2007, and April 15, 2009, the Loan Agreement was modified pursuant to various modification agreements, which either increased the loan amount and/or extended the maturity date of the Loan, among other matters. Contemporaneous with each such modification, the repayment of the indebtedness thereunder was secured by an amendment to the existing Deed of Trust and recorded in the Official Records on December 16, 2005 as Instrument No. 20051216-0004773, March 23, 2007 as Instrument No. 20070323-0003004, and on August 28, 2009 as Instrument No. 20090828-0003209, respectively.

13.    On January 15, 2011, the Loan matured pursuant to its terms. On February 28, 2011, NSB provided Park Central with written notice of default (the "Alleged Default"), which demanded payment on or before March 10, 2011 of the total of $25,424,490.00, consisting of principal in the amount of $25,162,488.40 and accrued interest in the amount of $262,001.60.

14.    Upon information and belief, on or about March 10, 2011, METEJEMEI, LLC, a Nevada limited liability company (""MET"), purchased the Loan from NSB for approximately $15,000,000.00 and took an assignment of its Deed of Trust, which assignment was recorded in

the Official Records on March 11, 2011 as Instrument No. 20110311-0002470.

15.    On March 17,2011, MET served notifications to each of Park Central's tenants of the Alleged Default and directed the tenants to pay MET instead of Park Central as a result (the "Rents Enforcement Notice").

16.    On March 18, 2011, MET provided Park Central with the Rents Enforcement Notice and written notice of the Alleged Default under the Deed of Trust.  Subsequent to receipt of the Rents Enforcement Notice, and per GT's direction, Park Central sent GT the sum of $75,000.00, and Matthew L. Johnson & Associates, P.C. ("Johnson") the sum of $40,000.00. Johnson has since formed Johnson & Gubler, P.C.  At the time, it was anticipated that Johnson would principally serve as Park Central's special litigation counsel for any litigation with MET and/or NSB related to the Loan.

17.    Park Central retained GT as its counsel for a Chapter 11 bankruptcy case based upon the representations of GT, by and through Olson, who represented himself as an experienced bankruptcy attorney.   Olson was the primary attorney responsible for the bankruptcy case aspect of Park Central's file at GT.  Olson was a shareholder with GT and was assigned to the firm's Business Reorganization & Financial Restructuring practice group.  Olson is board certified in Business Bankruptcy by the American Board of Certification.

18.    Although not disclosed to Park Central at the time of its retention of GT nor at anytime during the Chapter 11 Case, the great majority of Olson's bankruptcy practice involves the representation of creditors and lenders in bankruptcy proceedings, and he has not regularly represented Chapter 11 debtors and rarely single asset real estate debtors in particular.

19.    Although GT assigned other lower level attorneys to assist Olson on Park Central's Chapter 11 Case, including but not necessarily limited to Kara B. Hendricks, Esq.

("Hendricks"), Nevada Bar No. 7743, those associates lacked substantial Chapter 11 bankruptcy experience. Hendricks was an "of counsel" with GT, and was assigned to both the firm's Litigation Group and its Pharmaceutical, Medical Device & Health Care Litigation Group.

**B.     Park Central's Chapter 11 Case**

20.    On March 23, 2011 (the "Petition Date"), and in reaction to MET's Rents Enforcement Notice, among other matters, Park Central filed its Voluntary Petition for relief under Title 11 of the United States Code (the "Bankruptcy Code"), as Case No. BK-S-ll-14153-BTB (the "Chapter 11 Case") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"). Park Central was authorized to operate its business and manage its property as a debtor in possession.

21.    On its Voluntary Petition, Park Central indicated that it was a "single asset real estate" debtor pursuant to Section 101 (5IB) of the Bankruptcy Code, thereby imposing certain deadlines in the Chapter 11 Case, including specifically the requirement pursuant to Section 362(d)(3) of the Bankruptcy Code that within 90 days of the Petition Date (e.g., on or before June 21, 2011), Park Central had to either file a proposed Chapter 11 plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time, or Park Central had to start making monthly payments to MET in an amount equal to interest at the then applicable non-default contract rate on the value of the creditor's interest in the real estate.

22.    As of the Petition Date, Park Central was receiving net monthly rental income from its tenants in the approximate amount of $88,801.50 per month, plus Common Area Maintenance Charges that totaled approximately $17,925.69 per month, for a total of $106,727.19. As of the Petition Date, the average monthly cost to operate and maintain the Property prior to debt service was less than $30,000.00 per month, thus leaving an approximate

$75,000.00 surplus prior to debt service.

23.    On April 6, 2011, Park Central filed a disclosure of compensation of attorneys, which provided that GT had received $66,719.57, of which sum GT held the sum of $60,000.00 as of the Petition Date in its retainer account to be applied to future fees and costs after allowance by the Bankruptcy Court.

24.    On April 7, 2011, GT filed its application to be retained as Park Central's general reorganization counsel (the "GT Retention Application"), which indicated that Olson's standard rate was $525.00 per hour, and Hendrick's standard rate was $375.00 per hour. The GT Retention Application represented that the firm had extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code, including real estate related bankruptcies in Nevada. The GT Retention Application was supported by a declaration from Olson (the "Olson Retention Declaration"), which had attached to it a copy of Park Central's Legal Representation Agreement with GT.

25.    Although not disclosed in the Olson Retention Declaration, upon information and belief, GT has previously represented NSB in certain matters, including but not necessarily limited to the following: (a) intellectual property matters such as a U.S. federal trademark registration filing on or about November 17, 2006 by then and current GT partner Lauri S. Thompson, Esq., and (b) an action commenced on July 2, 2010 by then and current GT partner Thomas F. Kummer, Esq. in the Eighth Judicial District Court, Clark County, Nevada (the "Nevada State Court") as Case No. A62020 3. Additionally, although also not disclosed in the Olson Retention Declaration, GT partner Michael J. Bonner, Esq. has a connection with NSB because he has served on the Las Vegas Chamber of Commerce Board of Trustees with Dallas E. Haun, the President, Chief Executive Officer and Chairman of the Board of Nevada State

Bank.

26.     On April 12, 2011, MET filed a response to the GT Retention Application, which made various arguments, including a demand for clarification of the monies received by GT pre- petition. In response to MET, the Olson Retention Declaration was later supplemented to indicate that GT had received a $75,000 retainer pre-petition, $8,280.43 of which was paid in March 2011, and an additional $6,719.57 to other pre-petition services thereafter, thus leaving $60,000 in GT's retainer account as of the Petition Date.

27.     On April 19, 2011, MET commenced an action in Nevada State Court as Case No. A-11-639646-B (the "State Court Action") against the Guarantors to enforce their Guaranties of the Loan.

28.     On April 19, 2011, and again on June 6, 2011, the Bankruptcy Court entered orders allowing Park Central to use MET's cash collateral on an interim basis, including principally the rents generated from the Property, for a certain period during the pendency of its Chapter 11 Case in order to continue operating, subject to certain stated terms and conditions as set forth therein.

29.     On April 29, 2011, and again on June 7, 2011, the Bankruptcy Court entered orders authorizing the retention of GT on an interim basis. GT's retention on behalf of Park Central as its general reorganization counsel does not appear to have ever been approved by the Bankruptcy Court on a final basis in Park Central's Chapter 11 Case.

30.     On May 2, 2011, and after the review, discussion and approval of the GT Defendants, Park Central's managers sent a memo to its members indicating that it was Park Central's intention to file a plan of reorganization with the Bankruptcy Court and emerge from bankruptcy; however, that such a plan was expected substantial resistance from MET. Further,

this memo indicated that Park Central did not currently anticipate being able to file a plan that could pay the entire amount MET claimed it was owing, and thus that further capital contributions from Park Central's members would be required and necessary in order to fund a 'new value' style proposed plan of reorganization in order for the existing members to retain their ownership interests in Park Central.

31.     On May 12, 2011, the GT Defendants filed an application (the "Johnson Retention Application") on behalf of Park Central and seeking to retain and employ Johnson as Park Central's special counsel, as well as a Declaration of Johnson in support thereof. The Johnson Retention Application indicated that the intended scope of the proposed retention would principally be to serve as special litigation counsel for any litigation with MET and/or NSB related to the Loan, including but not limited to a defense of the State Court Action, but also raising various counterclaims. Johnson is board certified in Business Bankruptcy law by the American Board of Certification. The Johnson Retention Application indicated that it had received a retainer from Park Central prior to the Petition Date in the amount of $40,000. Johnson's standard rate as set forth in the Johnson Retention Application was $375.00 per hour. Johnson's Declaration indicated that his law firm had no connections with Park Central, creditors or any other party in interest. Notwithstanding the foregoing, upon information and belief, Johnson was presently representing NSB in other unrelated matters and/or had previously represented them, however, the specifics of such representation are not known. The GT Defendants filed the Johnson Retention Application more than six weeks after the Petition Date, and Johnson Retention Application was not heard until approximately ten weeks after the Petition Date, thus resulting in significant time being lost to engage in such litigation, and thereby minimizing, if not altogether eliminating the effect such pending litigation could have

had in the Chapter 11 Case. To the extent Park Central did have counterclaims against MET and/or NSB, the delay in filing that amounted to several months and the ultimate denial of the Johnson Retention Application essentially prevented Park Central from using this litigation threat as a means to bring leverage on MET and any proposed plan of reorganization.

32.    Both MET and the Office of the United States Trustee (the "UST") filed objections to the Johnson Retention Application. MET's objection first argued that the Johnson Retention Application proposed to represent both Park Central and the Guarantors in MET's State Court Action, including specifically the counterclaims that such parties were intending to assert against MET and/or NSB, which dual representation it asserted constituted an inherent conflict of interest mandating disqualification. Second, MET argued that Johnson had a clear conflict of interest because of its ongoing representation of NSB in other matters.

33.    On May 31, 2011, Keith Harper, MAI of Valuation Consultants issued an appraisal report for Park Central's Property which indicated an "as is" market value as of May 19, 2011 of $20,430,000 (the "Harper Appraisal") with an exposure and marketing time of twelve (12) months. The foregoing valuation assumed that the highest and best use for the improvements as constructed is their continued use, and for the vacant land as holding for future commercial development. The foregoing opinion of value in the Harper Appraisal was allocated as $12,930,000 to the six (6) existing multi-tenant retail buildings, vacant bar/tavern, and the four ground leased pad sites, and $7,500,000 to the twelve vacant, finished pad sites.

34.    In addition to the Harper Appraisal, additional evidence of valuation includes various letters of intent that Park Central received from various parties for the purchase of certain of the pads, including a Taco Bell franchisee for approximately $500,000 (pad 3), and

from Bridgestone Tire for $980,000 (pad 15). The actual purchase prices for such pads had they proceeded may have been in excess of the offers made in the letters of intent.

35.    On June 6, 2011, Olson sent an e-mail to Park Central's managers and Guarantors indicating that "any plan will require a substantial new value contribution in order to be confirmed over [MET's] objection. We need to have commitments from the members who want an ownership interest in the reorganized debtor before filing the plan."

36.    At a hearing on June 7, 2011, the Court orally denied the Johnson Retention Application to the principal extent sought therein, including specifically prosecution of the threatened action against NSB arising out of or related to the Loan. The GT Defendants also did not undertake the representation of Park Central's interests in any litigation against NSB arising out of or related to the Loan, in spite of such litigation potentially being necessary to allow for a confirmable plan of reorganization in its Chapter 11 Case.

37.    On June 9, 2011 and again on June 13, 2011, the GT Defendants had meetings and/or telephone calls with Park Central and the Guarantors concerning potential options for a Chapter 11 plan of reorganization, among numerous other matters regarding the status of Park Central's Chapter 11 Case.

38.    On July 1, 2011, and again on July 19, 2011, the Court entered orders approving stipulations between Park Central and MET to extend Park Central's deadline for filing a proposed plan as required by section 362(d)(3) of the Bankruptcy Code given Park Central's admitted status as a single asset real estate debtor.

39.    On July 26, 2011, MET filed its Proof of Claim, Claim No. 2 in Park Central's Chapter 11 Case, in the total amount of $25,674,934.24, which consisted of $25,162,488.40 in principal, $335,886.88 in non-default interest, $176,558.96 in default interest, plus additional

per diem interest, reasonable fees, costs and expenses incurred. There was no objection to MET's proof of claim filed and thus it was deemed allowed unless and until Park Central objected to it.

40.    Aside from any alleged unsecured deficiency claim held by MET, Park Central's bankruptcy schedules and claims register also had other allowed general unsecured, non-insider claims amounting to in excess of at least $11,441.61.

41.    On July 27, 2011, MET filed a motion seeking to disgorge from Johnson the $40,000 retainer Park Central paid to Johnson pre-petition, which matter was set for hearing on August 23, 2011.

## C.    The GT Defendants' Advice Regarding Park Central's Chapter 11 Plan Options

42.    The GT Defendants, by and through Olson, indicated to Park Central that Park Central lacked any possibility of ever confirming a plan of reorganization absent either: (a) MET's consent, which would not be forthcoming because of its pre-petition conduct seeking to force a foreclosure and because MET had purchased the Loan at a discount and for the specific reason of foreclosing and retaking the Property; or (b) Park Central's principals investing at least $2,000,000 cash into Park Central as part of a "new value" plan of reorganization, which suggested "new value" dollar amount was calculated by taking the value of Park Central's Property as set forth in the Harper Appraisal as compared with the total alleged claim of MET. However, Olson also advised that, even if $2,000,000 to $5,000,000 in "new value" was invested, it was still very unlikely a plan of reorganization would be confirmed, and that the "new value" would be at-risk and potentially be lost in the event a plan or reorganization was not approved. Based upon and in reliance upon the advice of the GT Defendants that even if "new value" was paid a plan of reorganization was very unlikely to be confirmed, and that the

"new value" would potentially be at-risk in the event a plan was not confirmed, Park Central assumed it had no other option than a voluntary "give up" settlement of its Property as suggested by the GT Defendants. Park Central was never provided any legal memorandum or substantive analysis explaining in any significant detail the specific reasons for the GT Defendants' recommendation that Park Central lacked any realistic possibility for a Chapter 11 plan of reorganization to save the Property.

43.    A creditor like MET may choose to have its entire claim treated as a secured claim by making an election under Section 1111(b) of the Bankruptcy Code. If a Section 1111(b) election is made, the creditor foregoes any recourse that it may have as an unsecured creditor for the value of its claim in excess of the value of the collateral, and the creditor is treated as holding a secured claim for the full allowed claim. In other words, under Section 1111(b), an under secured creditor may elect to have its entire claim treated as a nonrecourse secured claim, thereby foregoing any unsecured deficiency claim. The GT Defendants failed to discuss or analyze with Park Central the possibility that if MET did make a Bankruptcy Code § 1111(b) election, thereby requiring MET's entire claim to be treated as secured for the purposes of a plan of reorganization, that the payment of such claim could still be substantially modified, deferred and "stretched out" under a proposed plan, provided that such treatment did not "discriminate unfairly," was "fair and equitable," and as long as MET would retain its lien securing its claim and would receive deferred cash payments totaling at least the allowed amount of its claim. In other words, such a plan could have allowed Park Central to have retained some or all of the Property, while still making a modified payment to MET over time, which may have also eventually allowed for a return to Park Central's members after payment of MET.

44.    The GT Defendants failed to discuss or analyze with Park Central the possibility that if MET did not make a Bankruptcy Code § 1111(b) election, and thus that MET's claim would have been bifurcated into a secured claim up to the value of the Property, and an unsecured deficiency claim for the balance, that Park Central still had a potentially viable plan of reorganization because such a plan could have treated MET's secured and unsecured claims pursuant to a substantially modified and "stretched out" repayment schedule, and could have separately classified MET's unsecured deficiency claim in a different class and separate and apart from Park Central's other general unsecured trade claims, such that the general unsecured trade class of creditors could have still served as the required impaired accepting class needed for the "cramdown" or nonconsensual approval of such a plan of reorganization over MET's objection.

45.    The GT Defendants failed to discuss or analyze with Park Central the possibility that a proposed plan of reorganization could seek to substantially alter repayment terms of an existing claim, including such terms as a 10 year period of "interest only" payments on the total indebtedness, with such payments being calculated on a 20 or even 30 year amortization schedule.

46.    The GT Defendants failed to discuss or analyze with Park Central the possibility that a proposed plan of reorganization could also seek to impose a discount rate or "cramdown interest rate" at a market rate on such a modified repayment obligation under a confirmed plan that would be subject to a market test generally equal to the prime rate of interest plus a risk adjustment generally ranging from 1%-3%. Such a modified interest rate could have been significantly less than the contract rate or default rate of interest per annum under the existing Loan documents, thus providing additional relief to Park Central as part of a potential plan of

reorganization, including a necessary "breathing spell" to allow it to ramp up its tenancy, property sales and other transactions to contribute to a confirmable plan.

47.      The GT Defendants failed to discuss or analyze with Park Central that a proposed Chapter 11 plan of reorganization could have also involved any number of additional mechanisms to lessen the burden that the restructured monthly payments under a confirmed Chapter 11 plan of reorganization would impose.  Such additional mechanisms may have included, but not necessarily be limited to, the following: (a) the periodic future sale of certain parcels of the Property, and after they had appreciated with the passage of time and appropriate buyers had been found, with MET getting the net proceeds from such sales after commissions and other costs of sale, and in further repayment of its restructured indebtedness under a confirmed plan; (b) "new value" contributions from Park Central's existing members to meet shortfalls, but in amounts substantially less than the $2,000,000 or more the GT Defendants erroneously explained were required to "make up the difference" between the then apparent value of the Property and the total amount of indebtedness owing to MET; (c) future appreciation of the Property over time given that the Chapter 11 Case was filed immediately after a significant recession when property values and rental rates were historically depressed; (d) increased income from greater occupancy of the Property over time given that the Chapter 11 Case was filed immediately after a significant recession when property values, rental rates, and businesses were historically depressed.

48.      The GT Defendants failed to discuss or analyze with Park Central that a proposed plan of reorganization could have served as either an intermediate "bridge" until the property and rental markets as well as the general economy improved.  Thereafter, Park Central could have either sold the Property for an amount in excess of the remaining indebtedness

owing to MET, or refinanced the Loan with another lender at the appropriate time, but in either

scenario paying off MET in full and potentially without any prepayment penalty, and potentially

resulting in a substantial positive recovery for Park Central' members as well.

**D.    The Settlement Agreement and Dismissal of the Chapter 11 Case**

49.    On August 31, 2011, and upon the advice and recommendation of the GT

Defendants, Park Central filed a motion to approve a settlement agreement and release with

MET (as supplemented, the "Settlement Motion"), which sought approval of a proposed

Settlement Agreement (the "Settlement Agreement") between and among Park Central and the

Guarantors on the one hand, and MET on the other.  The Settlement Motion was not supported

by any affidavit or declaration by Park Central.

50.    The Settlement Agreement generally provided for "consensual" foreclosure of

the Property by MET in exchange for various relief, including specifically Park Central's

waiving any chance to file and seek confirmation of a Chapter 11 plan of reorganization,

thereby eliminating any chance Park Central and its members ever had for any recovery from

the Property.  Specifically, the Settlement Agreement included, but was not limited to, the

following general terms and conditions: (a) MET was entitled to relief from the automatic stay

to pursue its contractual and state law remedies, including but not limited to a non-judicial

foreclosure sale over the Property, and the immediate installation of a receiver over the Property

pending such foreclosure in order to manage the Property and collect the rents generated for the

benefit of MET; (b) changeover of the management of the Property from Park Central to a

property manager of MET's choosing; (c) a prohibition on Park Central and the Guarantors

bidding at MET's foreclosure sale over the Property; (d) MET proceeding to a non-judicial

foreclosure sale as quickly as possible, but in no event shall it be concluded later than March 4,

2012; (e) payment of all of Park Central's general unsecured, non-insider claims from MET's

cash collateral; (f) payment of $50,000 to each of Crest Ridge, LLC, and Infinity Enterprise

Investments, LLC, for pre- petition commissions and fees, and allowing them both to also retain

the $38,627 they each received pre-petition for similar matters; (g) return to MET the $40,000

paid to Johnson as that firm's retainer as proposed special counsel; (h) allowing GT to keep its

pre-petition retainer of $75,000.00 and even though such funds were paid from what constituted

MET's cash collateral; and (i) the exchange of mutual general releases among MET, on the one

hand, and Park Central, its members and Guarantors, on the other hand.

    51.    The GT Defendants' explanation on behalf of Park Central in the Settlement

Motion regarding why the Settlement Agreement should be approved consisted principally of

the following:

> The settlement contains a global resolution of all issues in the case
> including: (a) payment of undisputed non-insider pre-petition claims;
> (b) compromised payment of insider claims; and (c) returning
> collateral to [MET]. The alternative to settlement would be for Debtor
> to propose a plan of reorganization that would attempt to restructure
> the claim of [MET]. <u>Given that this case is a single asset real estate
> case and [MET] is owed far more than the Property is worth, Debtor
> believes that it would be difficult to confirm a plan over the objection
> of [MET]. Thus, the Debtor believes that the probability of
> reorganizing its financial affairs over the objection of [MET] is
> doubtful.</u>
>
> The issues encountered in presenting and litigating a plan of
> reorganization are not that complex. However, it would be expensive
> for Debtor to prepare a plan and disclosure statement, hire expert
> witnesses to prepare expert reports opining on the value of the
> property and the appropriate rate and term to be used in restructuring
> [MET]'s secured claim and generally pursue confirmation of a plan.
> Debtor believes that the Settlement is much less expensive for Debtor
> and will accelerate rather than delay payment to Debtor's undisputed
> non-insider creditors.
>
> As previously noted, this Court's approval of the Agreement is in the
> best interest of the estate because it provides for payment of all

unsecured creditor claims in this case and provides for a Receiver to oversee the operations of the Property until such time as [MET] completes legal foreclosure proceedings.

Accordingly, applying the foregoing, the <u>A&C Properties</u> factors are satisfied and, therefore, the Agreement is fair, reasonable, and adequate. (emphasis added).

52.     Notwithstanding the GT Defendants' knowledge of the disputes regarding its retention, the source of its retainer, that GT was only ever approved to be retained on an interim basis, and Park Central's dissatisfaction with its representation in the Chapter 11 Case and the result obtained, the GT Defendants did not advise Park Central of the desirability or indeed even the possibility of seeking the advice of independent legal counsel in connection with the Settlement Agreement, including as it related to the GT Defendants' retention of its retainer.

53.     At or about the time the GT Defendants made their recommendation to Park Central to enter into the Settlement Agreement and caused the Settlement Motion to be filed, thereby eliminating any possibility of Park Central keeping the Property, the GT Defendants had exhausted their existing retainer from Park Central.  In other words, even if Park Central had opted to refuse the proposed Settlement Agreement and persist to confirmation of a plan of reorganization adverse to MET and on a nonconsensual basis, the GT Defendants had not taken a sufficient retainer to cover such a potential contested proceeding.

54.     At a hearing on September 6, 2011, and in the absence of any objection, the Bankruptcy Court orally approved the Settlement Agreement.

55.     On September 7, 2011, the Court entered a written order granting MET relief from the automatic stay in the Park Central Chapter 11 Case (the "<u>Stay Relief Order</u>"), thereby beginning to effectuate the Settlement Agreement by allowing MET to enforce all of its contractual and state law rights and remedies, including but not limited to commencement and

conclusion of a non-judicial foreclosure sale regarding the Property.  Additionally, the Stay Relief Order permitted MET to take all actions necessary to seek and obtain the ex parte appointment of a state court receiver over the Property pending its foreclosure sale, which receiver would displace existing management and allow MET the benefit of all rents to be generated from the Property pending the foreclosure sale.

56.    On September 8, 2011, the Court entered an order approving the Settlement Agreement (the "Settlement Approval Order"), thereby authorizing and approving the Settlement Agreement and the transactions contemplated therein on behalf of Park Central.

57.    On September 9, 2011, and in further consummation of the Settlement Agreement, MET caused to be recorded in the Official Records a Notice of Breach and Election to Sell as Instrument No. 20110909-0002779, thereby recommencing its non-judicial foreclosure over Park Central's Property.

58.    On September 27, 2011, the GT Defendants filed their interim application seeking allowance of compensation and reimbursement of expenses from the Petition Date through August 31, 2011, in the amount of $96,907.50 in fees and reimbursement of expenses in the amount of $925.13 (the "Fee Application").  The Fee Application asserted that GT was authorized to be retained even though no final order had been entered authorizing its retention on a final basis, rather only various interim orders had been entered.  The Fee Application was supported by a Declaration executed by Olson.  Among other matters, the Fee Application indicated that the GT Defendants allegedly spent 34.9 hours related to a potential plan and disclosure statement for Park Central; however, most of this time was spent in preparing the disclosure statement to accompany a proposed plan, and not on any plan.

59.    At the time the GT Defendants filed their Fee Application, they were well aware

that Park Central and the Guarantors were extremely unhappy with the result obtained in the Chapter 11 Case by way of the Settlement Agreement, because that agreement essentially involved their giving up on any potential chance for a plan of reorganization that could have allowed them to keep and maintain the Property, and to continue to hold it for the anticipated future appreciation and value to be realized as a result. Notwithstanding the GT Defendants' knowledge of Park Central's and the Guarantors' dissatisfaction with the GT Defendants' representation in the Chapter 11 Case and the result obtained, the GT Defendants did not advise such parties of the desirability or indeed even the possibility of seeking the advice of independent legal counsel in connection with the Fee Application.

60.    On November 9, 2011, the Bankruptcy Court entered an order approving the GT Defendants' Fee Application. Nothing in the foregoing order indicated that it was approved on a final basis, and thus it was only approved on an interim basis.

61.    On December 12, 2011, and in further consummation of the Settlement Agreement, MET caused to be recorded a Notice of Trustee's Sale over Park Central's Property, which was recorded in the Official Records as Instrument No. 20111212-0000226.

62.    After MET caused to be conducted a non-judicial foreclosure sale of the Property in early January 2012, on January 9 and 13, 2012, various Trustee's Deeds Upon Sale were recorded with respect to Park Central's Property in the Official Records as Instrument Nos. 20120109-0000899 and 20120113-0002591, thereby transferring title to the Property to MET as a result of its credit bid at the foreclosure sale of the Property. Upon information and belief, MET remains the legal owner of the Property.

63.    On March 21,2012, Park Central filed a motion seeking to dismiss the Chapter 11 Case as a result of the Settlement Agreement and MET's foreclosure on the Property. On

COMPLAINT

20

April 6, 2012, the Bankruptcy Court entered an order granting the dismissal motion, however, the order did not "order otherwise" or alter the normal effect of such order pursuant to Section 349 of the Bankruptcy Code, including but not limited to that such order revests the property of the estate in the entity in which such property was vested immediately before the commencement of the bankruptcy case.

64.     At no point in Park Central's Chapter 11 Case did the Bankruptcy Court ever enter an order either authorizing the retention of the GT Defendants as general reorganization counsel on a final basis, or the allowance and payment of any fees and costs to the GT Defendants on a final basis; rather, all such orders were interim only.

### III.    CLAIMS FOR RELIEF

### A.    FIRST CLAIM FOR RELIEF

### (LEGAL MALPRACTICE)

65.     Park Central realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 64 above as though fully set forth herein.

66.     As set forth herein above, an attorney-client relationship existed between Park Central and the GT Defendants.  Pursuant to said relationship, the GT Defendants owed Park Central a duty to exercise reasonable care, skill, and diligence and to act competently in rendering of legal services.

67.     By their acts and omissions as alleged herein below, the GT Defendants breached their duty to exercise reasonable care, skill, and diligence and to act competently, failed to use the care and skill ordinarily exercised in like cases by reputable members of their profession practicing in the same or a similar locality under similar circumstances, and failed to use reasonable diligence and their best judgment in the exercise of their skill and the

accomplishment of their learning in an effort to accomplish the best possible result for Park Central:

        a)      The GT Defendants, by and through Olson, indicated to Park Central that Park Central lacked any possibility of ever confirming a plan of reorganization absent either: (a) MET's consent, which would not be forthcoming because of its pre-petition conduct seeking to force a foreclosure and because MET had purchased the Loan at a discount and for the specific reason of foreclosing and retaking the Property; or (b) Park Central's principals investing at least $2,000,000 in cash into Park Central as part of a "new value" plan of reorganization, which suggested "new value" dollar amount was calculated by taking the value of Park Central's Property as set forth in the Harper Appraisal as compared with the total alleged claim of MET. However, Olson also advised that, even if $2,000,000 to $5,000,000 in "new value" was invested, it was still very unlikely a plan of reorganization would be confirmed, and that the "new value" would be at-risk and potentially be lost in the event a plan or reorganization was not approved. Based upon and in reliance upon the advice of the GT Defendants that even if "new value" was paid a plan of reorganization was very unlikely to be confirmed, and that the "new value" would potentially be at-risk in the event a plan was not confirmed, Park Central assumed it had no other option than a voluntary "give up" settlement of its Property as suggested by the GT Defendants.

        b) The GT Defendants failed to discuss or analyze with Park Central the possibility that if MET did make the Bankruptcy Code § 1111(b) election, thereby requiring MET's entire claim to be treated as secured for the purposes of a plan of

reorganization, that the payment of such claim could still be substantially modified, deferred and "stretched out" under a proposed plan, provided that such treatment did not "discriminate unfairly," was "fair and equitable," and as long as MET would retain its lien securing its claim and would receive deferred cash payments totaling at least the allowed amount of its claim. In other words, such a plan could have allowed Park Central to have retained some or all of the Property, while still making a modified payment to MET over time, which may have also eventually allowed for a return to Park Central's members after payment of MET.

c)       The GT Defendants failed to discuss or analyze with Park Central the possibility that if MET did not make the Bankruptcy Code § 1111(b) election, and thus that MET's claim would have been bifurcated into a secured claim up to the value of the Property, and an unsecured deficiency claim for the balance, that Park Central still had a potentially viable plan of reorganization because such a plan could have treated MET's secured and unsecured claims pursuant to a substantially modified and "stretched out" repayment schedule, and could have separately classified MET's unsecured deficiency claim in a different class and separate and apart from Park Central's other general unsecured trade claims, such that the general unsecured trade class of creditors could have still served as the required impaired accepting class needed for the "cramdown" or nonconsensual approval of such a plan of reorganization over MET's objection.

d)       The GT Defendants failed to discuss or analyze with Park Central the possibility that a proposed plan of reorganization could seek to substantially alter repayment terms of an existing claim, including such terms as a 10 year

period of "interest only" payments on the total indebtedness, with such payments being calculated on a 20 or even 30 year amortization schedule.

e)      The GT Defendants failed to discuss or analyze with Park Central the possibility that a proposed plan of reorganization could also seek to impose a discount rate or "cramdown interest rate" at a market rate on such a modified repayment obligation under a confirmed plan that would be subject to a market test generally equal to the prime rate of interest plus a risk adjustment generally ranging from 1%-3%. Such a modified interest rate could have been significantly less than the contract rate or default rate of interest per annum under its existing loan documents, thus providing additional relief to Park Central as part of a potential plan of reorganization, including a necessary "breathing spell" to allow it to ramp up its tenancy, property sales and other transactions to contribute to a confirmable plan.

f)      The GT Defendants failed to discuss or analyze with Park Central that a proposed Chapter 11 plan of reorganization could have also involved any number of additional mechanisms to lessen the burden that the restructured monthly payments under a confirmed Chapter 11 plan of reorganization would impose. Such additional mechanisms may have included, but not necessarily be limited to, the following: (a) the periodic future sale of certain parcels of the Property, and after they had appreciated with the passage of time and appropriate buyers had been found, with MET getting the net proceeds from such sales after commissions and other costs of sale, and in further repayment of its restructured indebtedness under a confirmed plan; (b) "new value" contributions from Park

Central's existing members to meet shortfalls, but in amounts substantially less than the $2,000,000 or more the GT Defendants erroneously explained were required to "make up the difference" between the then apparent value of the Property and the total amount of indebtedness owing to MET; (c) future appreciation of the Property over time given that the Chapter 11 Case was filed immediately after a significant recession when property values and rental rates were historically depressed; (d) increased income from greater occupancy of the Property over time given that the Chapter 11 Case was filed immediately after a significant recession when property values, rental rates, and businesses were historically depressed.

g)      The GT Defendants failed to discuss or analyze with Park Central that a proposed plan of reorganization could have served as either an intermediate "bridge" until the property and rental markets as well as the general economy improved.  Thereafter, Park Central could have either sold the Property for an amount in excess of the remaining indebtedness owing to MET, or refinanced the Loan with another lender at the appropriate time, but in either scenario paying off MET in full and potentially without any prepayment penalty, and potentially resulting in a substantial positive recovery for Park Central' members as well.

h)      GT assigned Olson to handle and oversee the Chapter 11 Case, despite Olson's lack of experience representing debtors in bankruptcy proceedings and lack of experience with single asset real estate debtors in particular.

i)      The GT Defendants proposed the retention of Johnson as special

counsel for Park Central, despite the fact that Johnson was already representing

NSB in other unrelated litigation as a current client, which said retention would

involve violation of Nevada Rules of Professional Conduct 1.7 and 1.8(b).

j)    The GT Defendants caused a substantial delay in filing the Johnson

Retention Application of more than six weeks after the Petition Date, and even

though Johnson's retention was clearly contemplated pre-petition due to the fact

that Johnson received a sizeable pre-petition retainer.  Although it is true that

MET's State Court Action was not filed until a few weeks post-petition, there is

nothing that would have prevented Park Central or the Guarantors from instituting

their own affirmative claims, if they really had them, or claims for declaratory

relief, through appropriate counsel.  To the extent Park Central did have such

claims, the delay in filing that amounted to several months and the ultimate denial

of the Johnson Retention Application essentially prevented Park Central from

using this litigation threat as a means to bring leverage on MET and any proposed

plan of reorganization.

68.    As a direct and proximate result of the GT Defendants' negligence, Park Central

has suffered damages in a sum in excess of $10,000.00.

69.    Park Central has been required to obtain the services of an attorney in order to

prosecute this action, and is entitled to recover reasonable attorneys' fees and costs of suit.

### B.    SECOND CLAIM FOR RELIEF
### (BREACH OF FIDUCIARY DUTY)

70.    Plaintiff realleges and incorporates by reference each and every allegation

contained in Paragraphs 1 through 69 above as though fully set forth herein.

71.    The relationship between the attorney and client is a fiduciary relationship of the very highest character and binds the attorney to the cost conscientious fidelity. Because of their role as attorneys for Park Central, the GT Defendants owed, at all times relevant hereto, a fiduciary duty to Park Central to act with the utmost care, good faith, and honesty in protecting Park Central's interests with respect to the attorney-client representation.

72.    By virtue of the attorney-client representation that existed between the GT Defendants and Park Central, the GT Defendants owed to Park Central a fiduciary duty, and by virtue of Park Central having placed confidence in the fidelity and integrity of the GT Defendants and in entrusting the GT Defendants with Park Central's representation in connection with Park Central's Chapter 11 Case, a confidential relationship existed at all times between Park Central and the GT Defendants.

73.    Despite having voluntarily accepted the trust and confidence of Park Central, and in violation of this relationship of trust and confidence, the GT Defendants abused the trust and confidence by favoring the interests of NSB and others over the legal rights and interests of Park Central.

74.    By their acts and omissions, the GT Defendants breached the fiduciary duty owed to Park Central as follows:

a)    The GT Defendants failed to make full written disclosure of conflicting interests to Park Central and to obtain Park Central's informed written consent, in violation of, inter alia, Nevada Rules of Professional Conduct Rule 1.7, 1.8, and/or 1.9;

b)    The GT Defendants failed to protect Park Central's interest in connection

with the Chapter 11 Case;

c)     The GT Defendants failed to disclose all facts, circumstances, and risks relevant to enable Park Central to make free and educated decisions regarding the subject matters of the representation;

d)     The GT Defendants failed to put Park Central's interests ahead of their own and engaged in self-dealing when they did not advise Park Central of the desirability or indeed even the possibility of seeking the advice of independent legal counsel in connection with the Settlement Agreement, including as it related to the GT Defendants' retention of their retainer, and in connection with the GT Defendants' Fee Application

75.     Park Central reasonably relied on the GT Defendants, as set forth hereinabove. As a direct and proximate result of the GT Defendants' breach of their fiduciary duty to Park Central, Park Central has been damaged in an amount in excess of $10,000.00.

76.     Furthermore, the GT Defendants' behavior set forth above amounts to oppression or malice, pursuant to Nevada Revised Statutes § 42.005, entitling Park Central to an award of exemplary and punitive damages against the GT Defendants, in an amount to the proven at trial.

77.     Park Central has been required to obtain the services of an attorney in order to prosecute this action, and is entitled to recover reasonable attorneys' fees and costs of suit.

## C.    THIRD CLAIM FOR RELIEF

### (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

78.     Plaintiff realleges and incorporates by reference each and every allegation

COMPLAINT

28

contained in Paragraphs 1 through 77 above as though fully set forth herein.

79.    In every contract between an attorney and client there exists an implied covenant of good faith and fair dealing that the attorney will not do anything to impair the client's right to receive the benefits under the contract.

80.    By their acts and omissions as alleged herein above, there existed an implied covenant of good faith and fair dealing that the GT Defendants would not do anything to impair the Park Central's rights to receive the benefits under the contract.

81.    As a result of the actions by the GT Defendants, Park Central has been damaged in an amount in excess of $10,000.00.

82.    Park Central has been required to obtain the services of an attorney in order to prosecute this action, and is entitled to recover reasonable attorneys' fees and costs of suit.

**WHEREFORE**, Park Central prays for judgment in its favor and against the GT Defendants, and each of them, as follows:

1.    For actual, compensatory, special and/or general damages in excess of $10,000;

2.    For an award of exemplary and punitive damages;

3.    For prejudgment and post-judgment interest;

4.    For reasonable attorneys' fees and costs of suit; and

5.    For any such other and further relief as the Court deems just and proper.

Dated this 30th day of May, 2014.

**ENENSTEIN & RIBAKOFF**
/s/ Robert A. Rabbat
Robert A. Rabbat, Esq.
Nevada Bar # 12633
3960 Howard Hughes Parkway, Suite 500
Attorneys for Plaintiff Park Central Plaza
32, LLC

COMPLAINT

29